IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

DOCKET NO.:19-11546-E

---

GREG TOLAR, REID TOLAR, ANDREW TOLAR,

Plaintiffs-Appellants

v.

MARION BANK AND TRUST, CO., and
BRADLEY ARANT BOULT CUMMINGS, LLC

Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.:2:13-cv-00132-MHH

---

REPLY BRIEF OF APPELLANTS

---

Alicia K. Haynes
Charles E. Guerrier
HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, AL 35226
(205) 879-0377 - voice
(205) 879-3572 - facsimile
akhaynes@haynes-haynes.com
ceguerrier@haynes-haynes.com

Date: December 17, 2019

## APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1, Fed. R. App. Proc. and Eleventh Circuit Rule 26.1-1, the undersigned counsel of record for the Appellants hereby certifies the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations and any publicly held corporation which owns 10% or more of the party's stock), and other identifiable legal entities related to a party that has an interest in this case.

1.     Bradley Arant Boult Cummings, Defendant-Appellee;

2.     Burr & Forman, LLP, Law firm representing Defendant-Appellee;

3.     Charles E. Guerrier, Attorney for Plaintiffs-Appellants;

4.     The Honorable Madeline Hughes Haikala, District Court Judge;

5.     Haynes & Haynes, P.C., Law firm representing Plaintiffs-Appellants;

6.     Alicia K. Haynes, Attorney for Plaintiffs-Appellants;

7.     Forrest S. Latta, Attorney for Defendant-Appellee;

8.     Marion Bank and Trust Co., Defendant-Appellee;

9.     Conrad Taylor, Defendant;

10. Andrew Tolar, Plaintiff-Appellant;

11. Greg Tolar, Plaintiff-Appellant;

12. Reid Tolar, Plaintiff-Appellant;

13. Robert C. Walthall, member of Board of Directors of Marion Bank and Trust Co. and attorney with Bradley Arant Boult Cummings;

14. Ronald S. Williams, Attorney for Defendant-Appellee;

15. Kathryn M. Willis, Attorney for Defendant-Appellee.

16. The Honorable John E. Ott, Chief United States Magistrate Judge, U.S. District Court.

17. Bainbridge, Mims, Rogers & Smith, LLP, Attorneys for Defendant-Appellee

18. Jennifer Hanson, Attorney for Defendant-Appellee

19. Bruce Rogers, Attorney for Defendant-Appellee

/s/ Charles E. Guerrier
Charles E. Guerrier
Attorney for Appellants Greg Tolar, *et al.*

# TABLE OF CONTENTS

APPELLANTS' CERTIFICATE OF INTERESTED PERSONS
    AND CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

    Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

    Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

    Other Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    RETALIATION NEED NOT BE THE SOLE CAUSE.. . . . . . . . . . . . . . . 1

II.   A REASONABLE JURY COULD CONCLUDE THAT MARION
    BANK'S ACTIONS WERE RETALIATORY.. . . . . . . . . . . . . . . . . . . . . . 5

    A.    The Bank Stopped Referring Matters To Greg Tolar Because
        His Daughter Filed EEOC Charges Against The Bank... . . . . . . . . . . 6

    B.    The Bank's Additional Actions Against The Appellants Were
        Similarly Retaliatory.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  BABC CAN BE HELD LIABLE FOR ITS OWN RETALIATORY
    ACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

**Cases:**

*Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731 (1983). . . . . . . . . . . . . . . . 22

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). . . . . . . . . . . . . . . . . 11

*Burlington N. & S.F.R. v. White*, 548 U.S. 53 (2006). . . . . . . . . . . . . . . . . . . . 11, 26

*Burrage v. United States*, 571 U.S. 204 (2014). . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . 25

*Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . 22

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). . . . . . . . . . . . . . . . . . . . . 11

*Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . 25

*Grier v. Partek Indus., Inc.*, 903 F.Supp. 1480 (M.D. Ala. 1995). . . . . . . . . . . . 25

*Gross v. FBL Finan. Servs., Inc.*, 557 U.S. 167 (2009). . . . . . . . . . . . . . . . . . 1, 2, 4

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Haas*, 48 F.3d 1153 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kentucky Retirement Systems v. EEOC*, 554 U.S. 135 (2008). . . . . . . . . . . . . . . . 2

*Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221 (3rd Cir. 1994), *vacated on other grounds*, 514 U.S. 1034 (1995), *reinstated in relevant part*, 65 F.3d 1072 (3rd Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McDuffie v. Broward Cnty*, 654 Fed. Appx. 408 (11th Cir. 2016). . . . . . . . . . . . 22

*McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068 (11th Cir. 1996). . . . . . . . . . . 2

*Meltzer v. City of Wilmington*, 932 F.Supp.2d 602 (D. Del. 2013). . . . . . . . . . . 12

*Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583 (9th Cir. 1993). . . . . . . . . . . . . . . . . 25

*Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 390 (1993). . . . . 22

*Poole v. Prince*, 61 So. 3d 258 (Ala. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). . . . . . . . . . . . . . . . . . . . . . . . . 2

*Shotz v. City of Plantation, Fla.*, 344 F.3d 1161 (11th Cir. 2003).. . . . . . . . . . . . . 25

*Smith v. Miami-Dade County*, 621 Fed. Appx. 955 (11th Cir. 2015). . . . . . . . . . . 22

*Stebbins v. Legal Aid of Arkansas*, 512 Fed. Appx 662 (8th Cir. 2013) . . . . . . . . 12

*Steffes v. Stepan*, 144 F.3d 1070 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 22, 26

*Storr v. Anderson School*, 919 F.Supp. 144 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . 25

*Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011). . . . . . 15, 16, 26

*United States v. Gomez-Castro*, 605 F.3d 1245 (11th Cir. 2010). . . . . . . . . . . . . 16

*Univ. Of Texas Sw. Med. Ctr v. Nassar*, 570 U.S. 338 (2013). . . . . . . . . . . . . 1, 4, 5

*Young v. City of Palm Bay*, 358 F.3d 859 (11th Cir. 2004). . . . . . . . . . . . . . . . . . 22

**Rules:**

Rule 32(a)(5), Fed. Rules App. Proc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 32(a)(6), Fed. Rules App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 32(a)(7)(B)(I), Fed. Rules App. Proc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 32(f), Fed. Rules App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Other Authorities:**

Alabama Rules of Professional Conduct.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*First Impressions Endure, Even In Brief Writing*, by Brian Garner, ABA Journal May 01, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## ARGUMENT

## I.    RETALIATION NEED NOT BE THE SOLE CAUSE.

Appellee Bank argues that, in order to prevail on their Title VII retaliation claim, Appellants must prove that a retaliatory motive was "the" but-for cause of the materially adverse actions they experienced.  (Bank's Brief, p. 23 n. 5.)  The Bank interprets this to mean that Appellants must prove that a retaliatory motive was the "sole" or "only" cause.   The Bank is mistaken.

In *Univ. Of Texas Sw. Med. Ctr v. Nassar*, 570 U.S. 338 (2013), the Supreme Court held "Title VII retaliation claims must be proved according to **traditional principles of but-for causation**, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at  360 (emphasis added).  This "but-for" standard relies heavily upon the Court's earlier decision in *Gross v. FBL Finan. Servs., Inc.*, 557 U.S. 167 (2009).  Consequently, understanding *Nassar* requires understanding *Gross.*

In *Gross*, the Supreme Court granted *certiorari* on the question whether a plaintiff must present direct evidence of age discrimination in order to obtain a mixed-motives jury instruction under the ADEA. *Gross*, 557 U.S. at 169-70.  But the Court did not answer that question. Rather, the Court turned its attention to what it

1

considered to be the threshold question: "Whether the burden of persuasion ever shifts to the party defending an alleged mixed-motives discrimination claim under the ADEA." *Gross*, 557 U.S. at 173.  Answering this question in the negative, the Court held "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action.  A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but for' cause of the challenged employer decision." *Gross*, 557 U.S. at 177-78.  Absent from the Court's holding is any statement that there can never be a mixed-motive case under the ADEA.

Further, the "but for" standard described in *Gross* is not the equivalent of the "sole cause" standard.[1]  The Court made this clear through the authorities it cited in *Gross*.  For example, the Court favorably cited *Kentucky Retirement Systems v. EEOC*, 554 U.S. 135 (2008), as an example of the proper application of "but for" causation.  *Gross*, 557 U.S. at 176.  An examination of *Kentucky Retirement Systems* reveals reliance upon *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993), where

---

[1]When Title VII was enacted, Congress considered and rejected an amendment that would have placed the word "solely" before "because of [the complainant's] race, color, religion, sex, or national origin."  See 110 Cong. Rec. 2728, 13837-13838 (1964).  As this Circuit has recognized, "[w]here Congress knows how to say something but chooses not to, its silence is controlling."  *In re Haas*, 48 F.3d 1153, 1156 (11th Cir. 1995). *See also McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1076 (11th Cir. 1996) (recognizing that all of the justices agreed in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) that "because of" does not mean "solely because of.")

2

the Court stated that a disparate treatment ADEA claim can succeed if the employee's protected trait actually **played a role** in that process and had **a determinative influence** on the outcome.  (Emphasis added.)

In *Nassar*, the Court faced a similar problem: Does the lessened causation standard applicable to Title VII discrimination claims apply to Title VII claims of unlawful retaliation?  *Nassar*, 133 S.Ct. at 2523.  Relying upon its analysis in *Gross*, the Court answered this question in the negative.  But, again, the Court never held that "but for" means "sole" causation, or ruled out the possibility of "mixed-motive" retaliation claims.

Nevertheless, the *Gross* and *Nassar* decisions caused some confusion, in part because of how the Court described its decision    For example, in *Gross*, the Court states that a plaintiff must prove "that age was **the** 'but-for' cause," *Gross*, 557 U.S. at 178 (emphasis added), but later holds that the burden of persuasion does not shift "even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  *Gross*, 557 U.S. at 180.  In *Nassar*, the Court reiterated its conclusion from *Gross*, that age must be "the but for cause of the prohibited conduct," *Nassar*, 133 S.Ct. at 2523, but then held "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was **a** but for cause of the alleged adverse action by the employer.  *Nassar*, 133 S.Ct. at 2534 (emphasis

added).

This confusion was resolved when the Court decided *Burrage v. United States*, 571 U.S. 204 (2014). In *Burrage*, a criminal case, the Court was required to determine whether a certain drug was the but-for cause of a person's death or injury. In answering this question, the Court construed the meaning of "but for" causation across the entire body of the law, explicitly relying on its own precedents in employment discrimination law.

> Last Term, we addressed Title VII's antiretaliation provision .... Given the ordinary meaning of the word "because," we held that §2000e-3(a) "require[s] proof that the desire to retaliate was [a] but-for cause of the challenged employment action." *Nassar*, *supra*, at ___ (slip op., at 11-12). The same result obtained in an earlier case interpreting a provision in the Age Discrimination in Employment Act that makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U. S. C. §623(a)(1) (emphasis added). Relying on dictionary definitions of "[t]he words 'because of'"-which resemble the definition of "results from" recited above-we held that "[t]o establish a disparate treatment claim under the plain language of [§623(a)(1)]. . . a plaintiff must prove that age was [a] 'but for' cause of the employer's adverse decision." *Gross v. FBL Financial*, 557 U.S. 167, 176 (2009).

*Burrage*, 571 U.S. at 213 (footnotes omitted; brackets in original.)

Of particular note is the fact that the Court modified its language from both

4

*Nassar* and *Gross*, so as to change the word 'the' to the word 'a'. This change cannot have been accidental. Justice Scalia was the author of the opinion in *Burrage*. As he told Brian Garner in October 2006: "If you see someone who has written a sloppy brief, I'm inclined to think that person is a sloppy thinker. It is rare that a person thinks clearly, precisely, carefully, and does not write that way. And contrariwise, it's rare that someone who is careful and precise in his thoughts is sloppy in his writing." *First Impressions Endure, Even In Brief Writing*, by Brian Garner, ABA Journal May 01, 2015.[2] The shift from 'the' to 'a' was no accident. It reflects agreement by a unanimous Court in *Burrage*, that retaliation need only be one of the factors producing the "but for" result.[3]

## II.    A REASONABLE JURY COULD CONCLUDE THAT MARION BANK'S ACTIONS WERE RETALIATORY.

Appellee Bank contends that summary judgment was properly entered in this case for two reasons: Appellants did not suffer any materially adverse actions and, even if they did, the Bank had legitimate, nondiscriminatory reasons for its actions.

---

[2]http://www.abajournal.com/magazine/article/first_impressions_endure_even_in_brief_writing, as visited on October 22, 2015.

[3]This point is also evident from the Court's discussion in footnote 3 of *Burrage*. There, the Court recognized that the *Price Waterhouse* "but-for" standard allowed a showing that discrimination was a "motivating" or "substantial" factor to shift the burden of persuasion to the employer to establish the absence of but-for causation. *Burrage*, 571 U.S. at 213 n. 3.

But a reasonable jury is not required to accept Appellee's version of the facts, particularly when they are in dispute.

### A.    The Bank Stopped Referring Matters To Greg Tolar Because His Daughter Filed EEOC Charges Against The Bank.

The Bank claims that it stopped referring matters to Greg Tolar because of the conflict of interest that arose when Greg took an obviously adversarial position against it. (Bank's Brief, p. 21.)  It also claims that there is no evidence that Ragan Youngblood's[4] exercise of any protected right was the "but for" cause of the Bank's actions.  (Bank's Brief, p. 19.)  But these two things are intertwined and cannot be as easily teased apart as the Bank would like.

It is undisputed that the Bank terminated Youngblood effective September 16, 2008. This action was initiated by the Bank's President because Youngblood had objected to his sexual advances and threatened to report him to the Bank.  (Doc. 91-3, p. 9.) It is undisputed that on September 22, 2008, Greg Tolar and his wife, Lori, met with the Bank's Chairman of the Board, Randy Richardson, and asked that he conduct an investigation into their daughter's complaints of sexual harassment.  They asked that Youngblood be placed on administrative leave and her insurance kept in force while the Bank investigated her claims.  (Doc. 78-1, p. 36; Doc. 91-16, pp. 56-9; Doc.

---

[4]Ragan Youngblood is Greg Tolar's daughter.  She went by the name Ragan Livingston while employed by the Bank.

6

78-7, p. 55-58.) There is no evidence that at that meeting Greg Tolar told Richardson that he was representing Youngblood in any capacity other than as her father. While a potential charge of discrimination may have been mentioned, Greg Tolar never stated that he was assisting his daughter in preparing or filing that charge. (Doc. 78-1, p. 37.)

Youngblood filed her handwritten EEOC charge on October 7, 2008 (Doc. 95-1, pp. 9-10.) A copy of this charge was mailed to the Bank. (Doc. 95-1, pp. 15-16.) Youngblood subsequently submitted a typed version of her charge at the EEOC's request. (Doc. 95-1, ¶ 8; pp. 12-13, 15-16.) Greg Tolar's name does not appear as counsel for Youngblood on either of these charges.

The only evidence the Bank has to support its claim that Greg Tolar was representing his daughter is a letter which he sent to the EEOC along with his daughter's amended charge in November 2008. While this document is contained in the EEOC administrative file, the Bank was not aware of this letter or its contents prior to the institution of the *Livingston* litigation. Preston Nichols testified, upon seeing the November 2008 letter that he did not recall having ever seen it before his deposition. (Doc. 78-3, p. 74.) Consequently, the Bank had no reason to believe that, when Greg and Lori Tolar met with the Bank's representative soon after Youngblood was terminated, that he was acting as Youngblood's attorney, rather than her father.

7

Indeed, it would be quite unusual for an attorney to take his wife to such a meeting if the purpose of the meeting was to discuss a client's claim.  To the extent the Bank argues, and the District Court concluded, that the Bank "believed" Greg Tolar was representing Youngblood, that conclusion can only be reached by drawing inferences from the undisputed facts favorable to the Bank.  This is inappropriate at summary judgment.

Further, it is undisputed that during that first meeting, the Tolars asked Richardson to keep Youngblood's health insurance in force while she looked for another job.  (Doc. 78-1, p. 36, Greg Tolar Dep. at p. 137.)  Richardson did not respond to that request[5], but he did remind Greg Tolar of the legal work he was then performing for the Bank.  (Doc. 78-7, p. 55-56.) Richardson and the Bank knew that even while Youngblood was working there she was struggling financially.  (Doc. 91-1, p. 37.) Richardson knew that struggle would be exacerbated by being unemployed. A reasonable person could conclude from the Tolar's request and the Bank's reaction that the Bank knew Youngblood would have to look to her father and his practice for financial support.  A reasonable jury could also conclude that Richardson's comment about legal work being performed by Greg Tolar was intended to serve as a veiled

---

[5]The Bank ultimately refused to place Youngblood on leave and extend her medical coverage.

threat that the Bank would stop referring legal work to Greg Tolar if his daughter pressed her sexual harassment claim.  (Doc. 78-7, p. 56.)

In October 2008, before the November 2008 letter was sent to the EEOC, the Bank stopped referring any legal matters to Greg Tolar.  The Bank also excluded Greg Tolar from the list of "Board Approved Attorney's [sic]" to be used by the Bank in the event a loan closing needed or required an attorney.  (Doc. 78-11, pp.8, 25; Doc. 91-12, p. 16.)  It is undisputed that no one at the Bank told Greg Tolar that it was no longer referring him legal work, for whatever reason, let alone because of a perceived conflict of interest. Regardless, Greg Tolar did not get any further work from the Bank after his daughter filed her charge.  (Doc. 78-1, p. 35.)

The Bank does not deny it stopped referring matters to Greg Tolar because he had spoken up on behalf of his daughter.  But, the Bank argues, its decision was based upon Greg Tolar becoming "adversarial" to the Bank.  "[O]nce it became clear that Greg was advising and representing his daughter, the Bank was uncomfortable continuing in an attorney/client relationship.  The Bank didn't take away his current files, which he was allowed to finish; but it elected not to send him any more legal work."  (Bank's Brief, p. 8.)  But the undisputed chronology of events proves this argument to be false.  The Bank had no knowledge that Greg was advising and representing his daughter until long after it decided to stop sending legal work to him

9

in October 2008.  A reasonable jury could conclude that the Bank has lied about the basis for its decision so as to conceal its own unlawful retaliatory motive, which was to retaliate against Youngblood for pursuing her claims by refusing to refer any additional legal work to her father.

The Bank also relies heavily upon its interpretation of the Alabama Rules of Professional Conduct to justify its conduct.  (Bank's Brief, pp. 38-42.)  But Appellee's argument is not the only one that can be made from those rules.  For example, the Comments to Rule 1.6, Confidentiality of Information, notes that "[a] lawyer, as an officer of the court and as a part of the judicial system, is charged with upholding the law.  One of the lawyer's functions is to advise clients so that they avoid any violation of the law in the proper exercise of their rights."  Ala. R. Prof. Cond., Rule 1.6, cmt.  Further, the comments to Rule 1.2, Scope of Representation, note that "[a] lawyer is required to give an honest opinion about the actual consequences that appear likely to result from a client's conduct."  Ala. R. Prof. Cond., Rule 1.2, cmt.  Assuming, for the sake of argument, that the Bank considered Greg Tolar to be its attorney, he had an obligation to give the Bank an honest opinion about the consequences of its actions by not properly responding to Youngblood's claims.  Youngblood was claiming that the Bank President had subjected her to a sexually hostile environment and then had her terminated when she complained.

10

This allegation raised two potential Title VII claims against the Bank: hostile environment and retaliatory discharge. The Bank could defend itself against the sexual harassment claim if it could demonstrate that, once it was aware of the claim, it took prompt and effective action to prevent and correct the conduct. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Further, the Bank could mitigate any potential damages flowing as a result of Youngblood's termination by placing her on administrative leave and continuing her benefits while the Bank investigated. *Burlington N. & S.F.R. v. White*, 548 U.S. 53 (2006). By meeting with Richardson to encourage the Bank to place Youngblood on administrative leave while it investigated Youngblood's claims of sexual harassment, Greg Tolar was actually advising the Bank to engage in conduct that would have helped establish an affirmative defense to his daughter's own claims. His advice was consistent with his ethical obligation to his client, the Bank, not inconsistent.[6]

The Bank claims that even if it did terminate its relationship with Greg Tolar because his daughter complained of sexual harassment, its decision was legitimate,

---

[6]Even if the Bank had the right to sever its relationship with Greg Tolar, that right does not include the right to violate Title VII in the process. The Rules of Professional Conduct do not create private causes of action or defenses to litigation. The establish a remedy that is solely disciplinary in nature. *Poole v. Prince*, 61 So. 3d 258, 281 (Ala. 2010).

citing *Stebbins v. Legal Aid of Arkansas*, 512 Fed. Appx 662 (8th Cir. 2013) and *Meltzer v. City of Wilmington*, 932 F.Supp.2d 602 (D. Del. 2013). Neither case is controlling.

*Stebbins* involved a plaintiff who sued Legal Aid for not agreeing to represent him in various legal matters. Legal Aid contended that it refused to represent Stebbins in his various lawsuits because he had not properly applied for legal aid's services and because of a conflict of interest which existed due to his current lawsuit against Legal Aid. *Stebbins* is not controlling here because it deals with a very different kind of conflict. Stebbins was both suing Legal Aid and asking it to represent him. That is not the situation the Bank was facing when it stopped referring business to Greg Tolar.

In *Meltzer*, the plaintiff was employed as an Assistant City Solicitor in the City's Law Department. After filing a charge of age discrimination, he filed suit against the City, his employer. The City insisted that he obtain an advisory opinion from the Delaware State Bar Association Committee on Professional Ethics concerning whether his status as a plaintiff in a lawsuit against the City would create a conflict of interest with his position as an attorney representing the City. *Meltzer*, 932 F.Supp.2d at 605. The Ethics Committee concluded that Meltzer's "continued employment by the City as an Assistant City Solicitor does not constitute a violation

12

of DLRPC 1.7." *Id.* at 606.  The opinion did note that "if Attorney's duties include representing the City in age discrimination cases or other areas of labor law that [raise] issues that significantly overlap with the issues raised in his lawsuit, then there may be a 'significant risk that the representation of [the City] will be materially limited by ... a personal interest of the lawyer.'" *Id.* at 606-607.

While the Court concluded that requiring Meltzer to obtain an ethics opinion was not an adverse action for the purposes of retaliation, the Court did conclude that the City's decision to suspend Meltzer without pay until he obtained the ethics opinion was a materially adverse action.  Ultimately, however, the Court concluded that the suspension was due to Meltzer's refusal to request the ethics opinion in a timely manner. *Meltzer* is not controlling. There is no evidence that, in October 2008, the Bank raised any concern about a conflicts of interest with Greg Tolar.  The Bank never asked him to obtain an ethics opinion about his continued work with the Bank while allegedly representing his daughter.  Further, it is not apparent his work for the Bank would create a conflict of interest.  Greg Tolar was not representing the Bank on any employment matters, let alone claims of sexual harassment and retaliation.  Consequently, there was no overlap between the issues being raised by his daughter (sexual harassment and retaliation in the workplace) and the legal work he was performing for the bank (loan closings).

Essentially, what the Bank is arguing is that an employer should be free to retaliate, economically or otherwise, against any attorney who opposes that employer's unlawful discriminatory conduct. That argument would mean that every employer would be free to retaliate against an attorney/employee if that attorney raises a discrimination claim against the employer. But we know that cannot be the case. *See Meltzer*; *Tucker v. Housing Authority of Birmingham Dist.*, 507 F.Supp.2d 1240 (N.D. Ala. 2006) (employer retaliated against former plaintiff/attorney by withdrawing position posting after plaintiff, who had sued employer for civil rights violations, applied for a position).

Even if the Bank's argument is reduced to one of "trust" or "loyalty," the argument makes no sense. Every attorney/employee who opposes discrimination in the workplace by challenging his employer's policies and practices could be terminated with impunity for being "disloyal" or "untrustworthy." No case has ever held that. Indeed, the Bank does not cite a single case to support the argument that attorneys are somehow exempt from the broad anti-retaliation provisions of Title VII.

The evidence supports the inference that the Bank withdrew its legal work from Greg Tolar to send a message to his daughter: Don't sue us or we will make it hard for you and your family. This threat had two parts. The first was the direct threat made to Youngblood through her attorney/father. If you pursue your claims, the

14

Bank will deprive you of the support which your father can provide to you through his work for the Bank.  But the message was also being addressed to her attorney, himself: pursue this claim and we will undermine your practice.  The District Court tried to sort through these two inferences and, ultimately, adopted the inference most favorable to the Bank: the bank's conduct against [Appellants], to the extent that part or all of it was retaliatory in the Title VII sense, was reprisal for Greg's opposition to unlawful employment practices by the bank's president." (Doc. 103, pp. 40-41.) But by drawing this inference the Court improperly resolved material issues of fact and selected the inference favorable to the Bank, contrary to the controlling summary judgment principles.

Everyone knows that retaliation or revenge can manifest itself in many forms. Anger following a romantic break-up can result in insults said directly to the former partner, negative comments said to others (in the hope of hurting the former partner), or damage to the former partner's home or automobile.  Regardless, all have the same intent: to harm the former partner, either directly or indirectly.  Terrorist groups who take hostages do not do so because of anything that the hostage, herself, has done. They do it to harm some third-party in order to coerce a result they want. The Supreme Court recognized as such in *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011).  "Title VII's antiretaliation provision prohibits any employer action

15

that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. ... We think it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Thompson*, 562 U.S. at 173 (internal citations omitted). *See also N.L.R.B. v. Advertisers Mfg. Co.*, 823 F.2d 1086, 1088 (7th Cir. 1987) ("To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations.")

"Jurors are not to be presumed ignorant of what everybody else knows. And they are allowed to act upon matters within their general knowledge, without any testimony on those matters." *United States v. Gomez-Castro*, 605 F.3d 1245, 1249 (11th Cir. 2010), *citing United States v. Marino*, 562 F.2d 941, 944 (5th Cir. 1977). A reasonable jury, considering all of the evidence in this case, could conclude that the Bank's actions as to Greg Tolar were motivated by a desire to harm Youngblood for opposing the Bank's conduct. In the words of the Supreme Court in *Thompson*, "[h]urting him was the unlawful act by which the employer punished" Youngblood. *Thompson*, 562 U.S. at 178. To the extent the District Court rejected this reasonable inference in favor of the one preferred by Appellants, it erred.

16

**B.**     **The Bank's Additional Actions Against The Appellants Were Similarly Retaliatory.**

The Bank argues that neither the AUFTA action it filed against Appellants nor its opposition to Greg Tolar's bankruptcy petition were motivated by retaliation. Rather, they were the ordinary result of Greg Tolar's own failure to pay back his loan. (Bank's Brief, pp. 26-37.)  The facts do not support this characterization.

There is no dispute that Greg Tolar had secured a loan from the Bank and, after the Bank stopped referring work to him, he defaulted on that loan, closed his practice, and moved to Prattville.  In the year leading up to October 2008, Greg Tolar had been earning approximately $ 3,500 per month performing legal work for the Bank. (Doc. 78-7, p. 19; Doc. 78-10, pp. 17-21; Doc. 78-1:pp. 32-33.)  Greg Tolar previously had a $100,000 line of credit with Regions Bank. In February 2008, the Bank agreed to assume and refinance this unsecured line of credit, totaling $ 98,416.50.  The new maturity date was January 31, 2009. After Youngblood was fired and the Bank severed its relationship with Greg Tolar, he was unable to make the payments on this loan.  In August 2009, unable to make a living in Marion, Greg Tolar sold his house in Marion, dissolved his law firm, and moved his practice to Prattville, where he started a new business from scratch.  (Doc. 78-1, pp. 4, 46; Doc. 78-18, pp. 71-75.)  The Bank agreed to extend the maturity date on his loan to January 30, 2010,

17

provided he paid a portion of the interest then due, which he did. (Bank's Brief, p. 7.) Despite this extension, Greg Tolar's limited income was insufficient to pay off this loan when it came due on January 30, 2010.

The Bank filed a collection action in the Circuit Court of Perry County against Greg Tolar, not only for the $98,416.50 unpaid loan, but also for a loan taken out by his son-in-law, for which he had countersigned. Judgment was entered in favor of the Bank on both loans for a total of $ 144,373.77 ($ 111,382.95 on the business loan; $ 32,990.82 on the countersigned loan). (Doc. 78-10, pp. 6-7, 12-15; Doc. 78-11, pp. 42-43.) Of the two loans at issue, only one was secured by property: the automobile loan. The line-of-credit granted to Greg Tolar was unsecured.

After obtaining both judgments, the Bank pursed garnishment against Greg Tolar's wages. (Doc. 78-16, pp. 9-10.) Greg Tolar testified through post-judgment interrogatories that, having dissolved the Tolar Law Firm, he had no assets to pay the Bank's judgments. (Doc. 78-18, pp. 71-75.) As of October 2011, Greg Tolar had not satisfied the judgments against him and the Bank was not pursuing any further efforts to collect on that debt. (Doc. 78-18, p. 4.) This all changed in November 2011, when attorneys with Appellee BABC deposed Youngblood. Through that deposition the Bank and BABC learned that both Youngblood and her husband were unemployed and dependent on the Tolars for a place to live. (Doc. 91-1, pp. 10, 69.) Two months

later, BABC took over representation of the Bank in the collections cases against Greg Tolar. (Doc. 78-3, pp. 49-50.) Upon learning that BABC had entered an appearance in the collection actions, Greg Tolar contacted two of BABC's attorneys stating he was willing to try to resolve the matter with the Bank and asked whether the Bank was willing to accept monthly payments. (Doc. 78-11, p. 55.) The Bank, through its attorneys, responded by filing a Fraudulent Transfer Act complaint against the James A. Tolar, Jr. Family Trust, the Trustees of that Trust, and Youngblood's brother, Reid Tolar, a beneficiary of the Trust. (Doc. 78-11, p. 88.) Greg Tolar was not named as an individual defendant.

BABC, acting on behalf of the Bank, took the position that the Bank could look to the Tolar Family Trust for payment of Greg Tolar's debts despite the fact that neither the Trust assets nor Greg Tolar's beneficial interest in the Trust had ever been pledged as collateral for either loan. Further, the trust document, itself, contained a spendthrift provision which prohibited the interest of any beneficiary from being alienated or encumbered. (Doc. 78-12, p. 90.) Nevertheless, on March 5, 2012, Appellees sought and obtained a TRO enjoining the Trust from making any distributions to Greg or Reid Tolar until the question of the validity of the addendum was resolved. (Doc. 78-18, pp. 115-119.)

Still unable to pay the judgments against him and unable to get the Bank to

19

agree to monthly payments, in April 2012, Greg Tolar filed for Chapter 13 bankruptcy. (Doc. 78-19, pp. 3-50; Doc. 78-1, p. 17.) Under his plan, Greg Tolar proposed paying 100% of the Bank's collection judgments over a period of 54 months. (Doc. 78-19, p. 52.) The Bank, again represented by BABC, objected to Greg Tolar's plan, claiming that his petition was "the latest in a long series of evasive tactics to avoid paying the Judgments owed" to it (Doc. 78-19, p. 64, ¶ 19), and that the plan was not in the best interests of the Bank because it did not account for the lost time value of money. (Doc. 78-19, p. 65, ¶ 21.) To support its argument the Bank claimed that Greg was a current income beneficiary of the family trust with "access to $270,654.43 in cash being held for his benefit by the Family Trust and his son." (Doc. 78-19, pp. 57, 58, ¶ 2.) These allegations falsely suggested that, prior to the addendum, Greg Tolar had available to him, for the payment of his personal debts, unlimited access to both the annual income of the Family Trust as well as the corpus of the Trust. The Bank, and BABC, knew otherwise. Nevertheless, the Bank sought and obtained a temporary restraining order in the Bankruptcy Court. (Doc. 78-20, pp. 16-64; 88-89.)

As a result of the pressure placed on the Tolar Family Trust, the Trust and Reid Tolar agreed to make a direct distribution to the Bank to satisfy the outstanding judgments against Greg Tolar, provided the Bank agreed to dismiss the UFTA action

20

in Perry County. But the Bank wanted more than the payment of its judgments. The Bank insisted that any settlement of the judgments include an agreement that Greg Tolar, Reid Tolar and Andrew Tolar dismiss the EEOC charges which they had filed against the Bank, as well as dismiss a separate lawsuit that the Trust had filed against the Bank alleging that the Bank had breached its fiduciary duty by permitting an unauthorized individual to cash out CD's owned by the Trust. (Doc. 78-1, p. 43, Doc. 78-20, pp. 91-93.) The Tolars rejected the Bank's proposal. Ultimately, the Trust advanced the funds to pay the judgments, the Bankruptcy petition was dismissed, and the parties filed a joint stipulation dismissing the Bank's UFTA claim. (Doc. 78-20, pp. 99-10; Doc. 78-12, pp. 62-64.)

The Bank argues that it had a reasonable basis in fact and law for filing the UFTA claim and for opposing Greg Tolar's bankruptcy petition. But this argument ignores the specific false accusations which the Bank was advancing. Contrary to the language of both the original Trust document and the addendum, the Bank looked to the Trust for payment of Greg Tolar's personal debts, claiming the Trust had "more than enough to pay MB&T's Judgments in full" (Doc. 78-19, p. 59 ¶ 5), and that Greg Tolar "secretly" owned assets transferred to other Trust beneficiaries of the Trust, and had access to "a mound of cash." (Doc. 78-19, p. 62, ¶¶ 12, 14.) Despite the Bank's claim that it brought the UFTA action in order to satisfy the judgments entered

21

against Greg Tolar, individually, the Bank did not name Greg Tolar as a defendant in the UFTA action. (Doc. 78-11, p. 88.)

A reasonable jury, considering all of the surrounding facts, could conclude that the Bank, through its agent BABC, brought the UFTA action and opposed Greg Tolar's bankruptcy petition in order to compound the legal proceedings involving Youngblood's father and other family members.

It is well settled that "clients must be held accountable for the acts and omissions of their attorneys." *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 390, 396 (1993); *accord McDuffie v. Broward Cnty*, 654 Fed. Appx. 408, 414 (11th Cir. 2016); *Young v. City of Palm Bay*, 358 F.3d 859, 864 (11th Cir. 2004). Furthermore, this Court has recognized that a lawsuit can, on occasion, be the basis of a retaliation claim. *Smith v. Miami-Dade County*, 621 Fed. Appx. 955 (11th Cir. 2015) (*per curiam*). According to this Court in *Smith*, the test for determining whether a counterclaim constitutes unlawful retaliation is whether the counterclaim was asserted "with a retaliatory motive and was lacking a reasonable basis in fact or law. *See Bill Johnson's [Rests., Inc. v. N.L.R.B.]*, 461 U.S. [731] at 748 [(1983)]; *Darveau [v. Detecon, Inc.]*, 515 F.3d [334] at 343 [(4th Cir. 2008)]." *Smith*, 621 Fed. Appx. at 960. As the Seventh Circuit observed in *Steffes v. Stepan*, 144 F.3d 1070 (7th Cir. 1998), "[r]etaliatory acts come in infinite variety." *Id.* at 1075. "[E]ven

actions taken in the course of litigation could constitute retaliation in appropriate circumstances." *Id.* For example, the Seventh Circuit referenced the Tenth Circuit's decision in *Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996) (holding that an employer committed unlawful retaliation by bringing forgery charges against a former employee in order to punish the employee for filing a charge of discrimination) and *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221 (3rd Cir. 1994), *vacated on other grounds*, 514 U.S. 1034 (1995), *reinstated in relevant part*, 65 F.3d 1072 (3rd Cir. 1995) (suggesting that investigating an employee who files a discrimination complaint to discover evidence of resume fraud or some other misconduct to justify terminating the employee could constitute unlawful retaliation) to support its conclusion that there is no absolute litigation privilege that would insulate otherwise actionable conduct under Title VII. *Steffes*, 144 F.3d at 1075.

A reasonable jury, viewing all of the evidence in a light most favorable to Appellants, and drawing all reasonable inferences in their favor, could conclude that the Bank, and its agent BABC, did not simply pursue its legal rights to collect on a debt. Rather, the Bank abused the litigation process in order to compound the harm it had already created when it stopped referring legal matters to Greg Tolar. This conclusion is supported by the gap of time between obtaining the judgments against Greg Tolar and the UFTA actions, as well as the false statements made in both the

23

UFTA and Bankruptcy proceedings. Further evidence of the Bank's true motivations in bringing these actions is reflected in the Bank's position with regard to Greg Tolar's offer to resolve the outstanding judgments: the Bank not only wanted those judgments satisfied, it wanted the Tolars to agree to dismiss the retaliation charges which they had filed with the EEOC. A reasonable jury could conclude that the Bank's actions were not motivated by an attempt to collect on their loans (which the Bankruptcy petition would have satisfied) but was driven by a desire to harm Greg Tolar and his family because his daughter filed charges with the EEOC.

The District Court's decision granting summary judgment on Appellants' retaliation claims should be reversed and the matter returned to the District Court for further proceedings.

## III.    BABC CAN BE HELD LIABLE FOR ITS OWN RETALIATORY ACTS.

BABC argues that it cannot be held liable for its conduct because it was merely acting as the agent of the Bank. (BABC Brief, pp. 9-10.) But the authority cited by BABC to support this argument is not controlling. BABC was not only an agent of the Bank. It is also an "employer" within the meaning of Title VII. BABC admits so in its Answer. (Doc. 9, ¶ 8.) BABC also admits that its attorneys initiated many of the actions which form the core of Appellants' retaliation claims. (Doc. 9, ¶¶ 7, 38,

39, 40, 42, 43, 46, 48, 53, 54, 70, 92 and 110.)

Because BABC is itself an "employer" within the meaning of Title VII, it can be held liable for its own conduct if that conduct amounts to retaliation. *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir. 1994) ("... Congress did not intend to impose individual liability for backpay damages under Title VII, unless the individual meets the statutory definition of employer."); *Storr v. Anderson School*, 919 F.Supp. 144, 148 (S.D.N.Y. 1996) ("We conclude that individuals who do not otherwise meet the statutory definition of 'employer' cannot be liable under Title VII or the ADEA.")

The authorities cited by BABC are not controlling. Each of those cases involved an "agent" who was not also an "employer." *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991) (no individual liability under Title VII); *Grier v. Partek Indus., Inc.*, 903 F.Supp. 1480 (M.D. Ala. 1995) (same); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583 (9th Cir. 1993) (same). Further, as noted above, *Grant v. Lone Star Co.* specifically recognizes that individuals may be held liable under Title VII if they otherwise qualify as employers.

There is nothing "new" about the claim that Appellants are making. In fact, it is not even "novel." Retaliation claims against individuals and separate corporations have been recognized where the language of the statute arguably reaches those entities. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180-83 (11th Cir. 2003)

(finding actionable retaliation against non-employee plaintiff who complained about violations of the Americans With Disabilities Act, where municipality commissioned an in-depth background investigation of the plaintiff and then disclosed sensitive personal information to the media for release to the public); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1280 (11th Cir. 2003) (when there is evidence that a separate entity was acting as a surrogate for another or was in a symbiotic relationship, both parties may be made proper defendants under Rule 19(a), Fed. R. Civ. Proc.)

The District Court's decision granting BABC's motion to dismiss was erroneous. Appellants' claims against BABC should be reinstated and the matter returned to the District Court for further proceedings.

## IV.  CONCLUSION

As the Seventh Circuit observed in *Steffes v. Stepan*, 144 F.3d 1070 (7th Cir. 1998), "[r]etaliatory acts come in infinite variety." *Id.* at 1075. And the retaliatory acts need not occur in the workplace in order to be effective. Actions that cause harm outside the workplace can be as effective as those causing workplace harm. *Burlington N. & S.F.R. Co. v. White*, 548 U.S. at 63. And employers who engage in retaliation often do so by harming innocent third-parties, making them aggrieved individuals entitled to relief. *Thompson v. North Amer. Stainless, LP*, 562 U.S. 170

26

(2011).  A reasonable jury could conclude that the Bank and its attorneys pursued a wide-ranging scheme to retaliate against Youngblood by attacking her family members, upon whom she relied for her support and sustenance.  The District Court erred by concluding otherwise.  The District Court's grant of summary judgment, as well as its decision to dismiss BABC from this litigation, should be reversed and the matter returned to the District Court for further proceedings.

Respectfully submitted,

 /s/ *Charles E. Guerrier*
Charles E. Guerrier
Counsel for Appellants Greg Tolar, *et al.*

## CERTIFICATE OF COMPLIANCE

I certify this brief complies with the type-volume limitation set forth in Fed. R. App. P., Rule 32(a)(7)(B)(I) in that, excluding the parts of the document exempted by Fed. R. App. P., Rule 32(f), this brief contains 6492 words.

I further certify this brief complies with the typeface requirements of Fed. R. App. P., Rule 32(a)(5) and the type-style requirements of Fed. R. App. P., Rule 32(a)(6) in that this document has been prepared using Wordperfect in 14-point font in Times New Roman.

  _/s/ Charles E. Guerrier_
Charles E. Guerrier (ASB-5123-E76Y)
Co-counsel for Appellants Greg Tolar, *et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Forrest S. Latta
Kathryn M. Willis
Christopher S. Burkhalter
BURR & FORMAN LLP
11 North Water Street
Suite 22200
Mobile, AL 36602

R. Scott Williams
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203

Bruce F. Rogers
Jennifer A. Hanson
BAINBRIDGE, MIMS, ROGERS & SMITH, LLP
Post Office Box 530886
Birmingham, AL 35253


 */s/ Charles E. Guerrier*
Charles E. Guerrier
Attorney for Appellants Greg Tolar, *et al.*